HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BANCROFT LIFE & CASUALTY ICC, LTD.,

                 Plaintiff,

     v.

CESAR SCOLARI, an individual,

                 Defendant.

CASE NO. C11-5017RBL

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

**FINDINGS OF FACT**

**A.  Overview**

    1.       Phil Sigel and Brad Barros set out to attract tax-weary, wealthy individuals.  Their vehicle of choice was an insurance company.  An off-shore insurance company shrouded in secrecy.  So secret that the insureds had to travel outside the country to read the insurance policy.  Not surprisingly, they attracted some 150 to 200 rich folks who operated closely-held companies.  One such individual, Cesar Scolari, was yearning for freedom from confiscatory taxes.  He ran a multi-million dollar logistics company with low overhead.  The two sides were a match made in heaven, or in Saint Lucia.

1      Sigel and Barros formed Bancroft.  They didn't know much about insurance so they

2  outsourced the underwriting function, actuarial responsibility, claims handling, accounting

3  function, due diligence inquiries, and routine paperwork chores.  They also outsourced much of

4  the investment operation.  One of Bancroft's primary investment vehicles was to make

5  commercial loans back to the various participants who gave their money to Bancroft in the first

6  place.  Not coincidentally, Bancroft would loan back 70% of the premium dollars that had been

7  committed for "coverages."  Bancroft would outsource responsibility for securing the loans and

8  perfecting the security to the borrower.  Perhaps not surprisingly, the perfection of the security

9  was, on occasion, "forgotten."   The insuring end of the business similarly went lacking.  Scolari

10  was asked how much he wanted to pay in premium dollars.  In 2006 he responded: $2.6 million,

11  and in 2007, $5 million.  In return, Scolari received a tax deduction for the full premium, and

12  insurance coverage that he and his company didn't need. He also received a promise that, if his

13  claims were low and the investments were successful, he would receive a refund of his premium

14  dollars after five years.

15      After considering volumes of facts and arguments in the run up to trial, this Court

16  observed on August 23, 2013 that "Bancroft's 'Premium Lite' insurance program is, at best, a

17  scheme, and at worst, a scam."  During the crucible of trial the Court realized the self-evident

18  truth that fraud permeated the entire transaction, and that both parties were fully committed to

19  the scheme.  Public policy will not be served by enforcing the agreements.  The parties stand *in*

20  *pari delicto*.  The Court will not degrade itself by shifting the loss between parties to an illegal

21  contract.

22

23

24

1    2.    A fool and his money soon part.

2    **B.  Background Facts Regarding the Parties.**

3    3.    Bancroft Life & Casualty ICC, Ltd. is a licensed insurance company domiciled in

4    the nation of Saint Lucia.

5    4.    Cesar Scolari has been a Washington resident since 2007.  Before that, he lived in

6    California.

7    **C.  Bancroft's Corporate History, Administrators, and Managers.**

8    5.    Bancroft was first formed as Bancroft Property & Casualty, Ltd. in the British

9    Virgin Islands on May 1, 2003.

10   6.    In 2005, the entitiy's name was formally changed to Bancroft Life & Casualty,

11   Ltd.

12   7.    In February 2006, Bancroft re-domiciled from the British Virgin Islands to Saint

13   Lucia.  Bancroft has existed under the laws of Saint Lucia since that time. .

14   8.    Bancroft formally changed its name to Bancroft Life & Casualty ICC, Ltd. in

15   2008.

16   9.    Under Saint Lucia law, the process of re-domiciling did not terminate Bancroft's

17   corporate existence in the British Virgin Islands and create a new corporate existence in Saint

18   Lucia, but rather continued the entity's same corporate existence based on the laws of the new

19   domicile jurisdiction.

20   10.   Bancroft re-domiciled upon the advice of its then-outside regulatory counsel, G.

21   Thomas Roberts  that doing so would be advantageous because of legislation then planned in

22   Saint Lucia that would allow Bancroft to offer "incorporated cells"—a new form of insurance

23   structure whereby new insurance companies could be established under the umbrella of

24   Bancroft's insurance license.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 3

11.     Bancroft Trust has always owned all of Bancroft's shares ..

12.     Philip Sigel has always been the trustee of the Bancroft Trust.

13.     Bradley Barros has never held more than a 50 percent beneficial interest in the Bancroft Trust.

14.     Sigel and Barros have been directors of Bancroft since 2003.. Nicholas John, a Saint Lucia attorney, was added as a third Bancroft director when Bancroft re-domiciled to Saint Lucia in 2006.  John remains a Bancroft director.

15.     From June 2003 through February 2006, Bancroft's local insurance manager in the British Virgin Islands was Belmont Insurance Management, Ltd. ("Belmont").

16.     In approximately 2004, Bancroft hired Intercontinental Management, Limited, d/b/a Intercontinental Captive Management Company, Limited ("ICMC"), a company located in Greensburg, Pennsylvania, to act as the third-party administrator of Bancroft's group insurance program.  ICMC was partly owned by Tom Roberts and Nigel Bailey.  Roberts was ICMC's president.

17.     Following Bancroft's re-domicile to Saint Lucia, International Captive Consultants, Limited ("ICC") acted as Bancroft's insurance manager from 2006 until 2009.  ICC was owned and operated by Nigel Bailey.

18.     Bancroft retained Tom Roberts and John Patton and their law firm, Roberts & Patton, who served as counsel from approximately 2004 until approximately September 2009.

19.     From the fourth quarter of 2009 until the present, Bancroft's insurance manager and third-party administrator has been CBIZ MHM, LLC.  CBIZ has a place of business in Bethesda, Maryland.  CBIZ has been approved as Bancroft's insurance manager by the Saint Lucia Ministry of Finance.

**D. Bancroft's Group Master Policy.**

20.      Bancroft offers insurance coverage through its "Premium Lite" group insurance program.

21.      To be eligible to participate in the Premium Lite insurance program, each Certificate Holder must first be a member of Association Benefits Group, Inc. ("ABG").

22.      ABG is incorporated in Delaware and is a subsidiary of Captive Educational Services, LLC.  The owner of Captive Educational Services, LLC, is Bradley Barros.  ABG is a fee-based membership association that sponsors the Premium Lite group casualty insurance program under Bancroft's Group Master Policy.  One of the benefits offered to ABG's member companies is access to Bancroft's Premium Lite program.

23.      Bancroft refers to each participant in the Premium Lite insurance program as a "Certificate Holder."

24.      Each participant in the Premium Lite insurance program receives annual certificates of insurance that describe the specific coverages placed by Bancroft.

25.      Each of the certificates of insurance provides that it "confirms that the Certificate Holder named below has Business Income and Risk insurance coverage under a Group Policy.  The Group Policy sets forth the terms and conditions of the insurance provided."

26.      Bancroft's business risk policy, or Group Master Policy, was first executed by Belmont on Bancroft's behalf and issued in the British Virgin Islands in 2003.

27.      Pursuant to a written services agreement with ABG, Chesterfield Services, Inc. acted as the first special purpose policy holder / named insured under the Group Master Policy.

28.      Bancroft representatives caused the Group Master Policy to be delivered to Chesterfield in the BVI.  Certificate Holders were informed that if they wanted to read the Master Policy they would have to go to BVI, (and later, to Saint Lucia), to read the policy.

1    29.    The Group Master Policy was amended on several occasions.  The parties hotly

2  dispute the existence of actual signed copies of many of the Amended Group Master Policies.

3  This dispute need not be resolved, as the authenticity of the document is not germane to the

4  Court's resolution of this case.

5    30.    In 2010, the special purpose policy holder and named insured was changed to

6  Sempre Fidelis.

7    31.    The shares of Sempre Fidelis are held in trust for the benefit of a Saint Lucia

8  resident, Rhikkie Alexander.  Sempre Fidelis is controlled and funded by Bancroft.  Rhikkie

9  Alexander was a client of Nicholas John.  John is a Bancroft Director, the incorporator of

10  Sempre Fidelis, and its original managing agent and registered agent.  Moreover, Bancroft

11  compensates Rhikkie Alexander for serving as nominal owner of Sempre Fidelis.

12    32.    All versions of the Group Master Policy since Bancroft moved to Saint Lucia

13  have provided that "the law of St. Lucia, West Indies shall be the choice of law for all legal,

14  equitable or administrative purposes and proceedings" and that insurance-based litigation must

15  be brought in the courts of Saint Lucia.

16    33.    The various versions of the Group Master Policy all provide that Bancroft "may

17  assess premiums at any time" if any Certificate Holder's the remaining reserves are inadequate,

18  "as determined by the actuaries for the Company in their sole discretion."  The various versions

19  of the Group Master Policy also allow Bancroft to cancel (1) coverage and (2) the right to

20  payment of any premium return benefit, if any such assessment is unpaid after 30 days.

21    34.    The original Group Master Policy provides that "[t]he rights and benefits under

22  the Policy or any Certificates of Insurance are not assignable."  However, the 2010 Version of

23  the Group Master Policy provides that "[n]o assignment of interest under this Policy or any

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 6

1   Certificate of Insurance may be made by any Insured [defined to include Certificate Holders]

2   without the express written consent of [Bancroft]."

3       **E.  Overview of Bancroft's Premium Lite Group Insurance Program.**

4       35.     The Group Master Policy is an insurance contract between Bancroft and the

5   named insured/special purpose policy holder.  Bancroft denies that it sells separate insurance

6   policies in the United States.

7       36.     When a United States-based business applies for and obtains coverage under the

8   Group Master Policy, the Certificate Holder is sent a certificate of insurance evidencing the

9   Certificate Holder's coverage under the Group Master Policy.

10      37.     Premiums paid by Certificate Holders go into Bancroft's pooled general reserves,

11  and are not maintained in separate accounts.

12      38.     Bancroft pays claims out of the pooled general reserves.

13      39.     One of the unique features of Bancroft's group insurance program is that, five

14  years after a premium payment is made, a Certificate Holder may be eligible for the return of a

15  portion of the total premium paid, depending on a variety of factors, including the investment

16  performance of the pool, the claims history of the pool, and the claims history of the particular

17  Certificate Holder.

18      40.     In the event that a Certificate Holder qualifies for such a premium return benefit,

19  the amount refunded is calculated as: (1) total premiums paid by the Certificate Holder, (2) plus

20  the Certificate Holder's pro rata share of all investment gains realized by the reserve pool, less

21  (3) the Certificate Holder's pro rata share of all investment losses realized by the reserve pool,

22  less  (4) 1.6 percent annual management fees, less (5) the Certificate Holder's pro rata share of all

23  claims paid out of the reserve pool, less (6) the Certificate Holder's pro rata share of general and

24  administrative expenses, less (7) any claims paid to that particular Certificate Holder.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 7

41.     No premium return benefit is available to a Certificate Holder who terminates coverage in the first three years after a premium payment is made.  If a Certificate Holder terminates after three years, but before the five year mark, Bancroft imposes a surrender charge of nine percent of the premiums paid.

42.     Bancroft's Group Master Policy allows Bancroft to make retrospective premium assessments of up to 60 percent of the total premium paid by the affected Certificate Holder.  If a Certificate Holder fails to pay such an assessment, Bancroft can cancel coverage, and all other benefits payable under the Group Master Policy—including the premium return benefit.

**F.  Bancroft's Commercial Loan Program.**

43.     Bancroft frequently loaned out a portion of premium dollars paid in by Certificate Holders and third parties.  Certificate Holders and their affiliates were permitted to borrow up to 70% of their premium payment.  Bancroft was supposed to require all loans to be secured by a recorded security interest, and to require that the collateral pledged have a minimum value of 140 percent of the loan amount.  All loans were to be memorialized by promissory notes.  Interest payments were made to the pool and the proceeds allocated on a pro rata basis to the allocable share of the reserves corresponding to each Certificate Holder.  Interest payments made by Certificate Holder borrowers are not allocated solely to that Certificate Holder's allocable share of the pooled reserves.

**G.  Staffworks, Inc. Applies for Insurance Coverage, is Underwritten by ICMC, and Makes its First Premium Payment.**

44.     In 2005, Cesar Scolari resided in California and was the sole owner and president of a multi-million dollar business headquartered in Southern California called Staffworks, Inc.

45.     By 2004, Staffworks was paying heavy taxes (including California State income tax) and Scolari tasked his CPA, William Fries, to find a tax advantaged investment opportunity or some tax sheltered program in order to reduce Staffworks and Scolari's tax burden.

46.     By 2005, Staffworks was one of the largest logistics companies in the United States, with approximately 1,000 employees, and it had over $25 million dollars in annual revenue.

47.     Fries told Scolari about a seminar he wanted to attend in Orange County regarding Offshore Captive Insurance Companies, and Scolari paid for Fries' registration.

48.     After attending the Offshore Captive Insurance seminar, CPA Fries recommended that Scolari meet with Matt Brown, a California tax attorney who was featured at the seminar, and Scolari agreed.

49.     Scolari met with Fries and Brown to learn about the program.  The offshore program, called "Premium Lite Program," was offered by Bancroft Life & Casualty, Ltd.

50.     Around July 2005, Scolari retained Brown as an attorney for a variety of purposes.

51.     Over the next several months, Brown attempted to sell Scolari and CPA Fries on the Bancroft "Premium Lite" Program, using documents and literature that had been provided to him by Bancroft.  Both Brown and the Bancroft documents emphasized that captive insurance companies are among the most profitable businesses in the world and that they offer significant tax deferral benefits for their owners and participants.

52.     Before Scolari would agree to participate in the Premium Lite Program, he asked to hear about Bancroft's commercial loan program, and about the investment components of the program, directly from a Bancroft representative.  In October of 2005 Scolari participated in a

conference call in which the "lawyer for Bancroft—Tom Roberts—addressed the investment aspect of the Bancroft Program and Bancroft's corporate loan program.

53.     Tom Roberts acknowledged the Premium Lite Program's investment component. He also confirmed certain investment representations contained in a document entitled, "Premium Lite" which Bancroft was circulating.

54.     Tom Roberts represented to Scolari that the Premium Lite Program had tax advantages, specifically in regard to the deductibility of insurance premiums.

55.     Roberts and Brown told Scolari that Scolari would decide how much he wanted to invest in the Premium Lite Program, and that his investment would be accomplished by means of paying insurance premiums.  Roberts said that Bancroft would then allocate those premiums among a number of different coverages, to be agreed upon by Scolari and Bancroft.

56.     Tom Roberts also educated Scolari about Bancroft's new commercial loan program, under which Bancroft could loan back to Scolari up to 70% of the amount of the premiums he paid into the Premium Lite Program.  Roberts said that there would be no tax consequences until the loans were paid off at the end of five years, and that then the taxes would be at the "capital gains rate."

57.     Tom Roberts advised Scolari that he would not have to use his own money, or his property, to repay the Bancroft loans, but instead the loans would be paid back (or distributed "in kind") from Staffworks' premium return benefit after five years.

58.     Scolari's decision to have Staffworks participate in the Premium Lite Program was based on the Premium Lite Program brochure, an Application; an April 8, 2005 opinion letter from the Greenberg Traurig law firm that described the program's structure; and the oral representations by Bancroft's agent, Tom Roberts.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10

59.     On November 1, 2005, Scolari signed an Application for Staffworks to become a member of ABG and for insurance coverage from Bancroft (the "2005 Application").

60.     Among other terms, the 2005 Application provides that "adverse tax treatment by the IRS and other taxing authorities" is one of the risks of participation in the Premium Lite program.

61.     The 2005 Application provides that the applicant understands and acknowledges that "no representations or assertions have been made by Bancroft Life & Casualty, Ltd. that promise or imply any rate of return on experience adjusted refunds of premiums, or that the Applicant will qualify for such a refund."

62.     The 2005 Application provides that "if an assessment is made and not fully paid, that coverage can be canceled retrospectively back to the initial date benefits were applied for (the date of this Application)."

63.     The 2005 Application provides that, other than the Application itself and the April 8, 2005 Greenberg Traurig opinion, the "Applicant may not rely on any other written or oral information provided by any other person."

64.     The 2005 Application also includes the following provisions and representations:

- The purchase of insurance involves certain risks.  These risks include, but are not limited to, losses in the Insurer's reserves, poor claims experience, insolvency of the Insurer and adverse tax treatment by the IRS and other taxing authorities."

- Staffworks "must be a duly authorized Member of the Association" to obtain coverage.

- "[p]remiums are held in the general reserves of the insurer."

- Staffworks "consulted with its attorney, CPA, or other appropriate tax, business or financial advisor and that the advisor(s) have determined that it was paying a reasonable premium."

- The applicant is a "sophisticated person with a substantial net worth in excess of USD $1,000,000."

- The Application and accompanying materials "do not constitute an offer to sell any insurance, security or investment product."

- "The insurance offered by Bancroft Life & Casualty ICC, Ltd. is not otherwise available in the State in which the Undersigned resides."

- Bancroft "is licensed and admitted in the British Virgin Islands," that "[t]he coverage cannot be offered in the United States," and that "[t]he benefits of this coverage may only be enforced within the jurisdiction and under the laws of the British Virgin Islands."

- "This Application does not constitute an offer to sell insurance, security or investment product."

- "The experience adjusted return of premium feature is dependent upon claims experience, expenses and investment results of the company as a whole, not the claims experience of the Applicant alone."

65.     The April 8, 2005 Greenberg Traurig opinion letter cautions that a Certificate Holder should not expect to receive any premium return benefit.  It reiterates that coverage is provided by Bancroft pursuant to the Group Master Policy, kept in BVI.

66.     In late October 2005, Scolari directed Staffworks staff to gather various materials requested by Brown for underwriting to be conducted by ICMC. Staffworks' representatives then forwarded this extensive documentation to ICMC.  The underwriting materials included Staffworks financial statements, tax returns, existing insurance policies, and other pertinent information.

67.     Shortly thereafter, Scolari and Brown had a conference call with ICMC's president, Tom Roberts, to discuss Staffworks' uninsured risks and the underwriting materials previously provided to ICMC.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 12

68.     Bancroft and its directors denied playing any role in the underwriting conducted for the Premium Lite program.  The underwriting function was entirely outsourced.  Bancroft's regulatory lawyer, Tom Roberts, doubled as underwriter of policies written by Bancroft.

69.     In November, 2005, ICMC conducted underwriting and ultimately prepared a "supplement to application," listing the various proposed coverages and premium costs for Staffworks' review and approval.  This document was transmitted on November 28, 2005.

70.     In November 2005, Staffworks paid its first $20,000 premium, by check payable to "Association Benefits Group".  This check was sent by Staffworks to ABG's Delaware office.

71.     On December 29, 2005, Staffworks made a second premium payment — $2,580,000 — by check payable to "Association Benefits Group."  This check was sent via overnight courier from Staffworks to ABG's Delaware office..

72.     Staffworks' premiums were initially deposited into ABG's account and ultimately transferred to Bancroft.

73.     Staffworks' total 2006 premium was $2,600,000, divided into eight coverages.  As an example, one coverage was "Loss of Income Resulting from Loss of Major Supplier."  "Major Supplier" was defined as "a supplier who contributes 25% or more of goods or services purchased by Staffworks in any one year."  The only major supplier to Staffworks' logistics business was the uniform provider for 1,000 workers.  The premium for that coverage was $600,000, returning an "annual benefit" of $500,000.  That coverage has no business purpose other than tax reduction.

74.     Scolari treated Staffworks' $2,600,000 premium payment as a deductible "ordinary and necessary" business expense on Staffworks' federal income tax return.

### H.  Bancroft Makes its First Commercial Loan to Scolari.

75.     While Staffworks was enrolling in the Premium Lite program, Brown advised Bancroft that Scolari would like to apply for a loan from Bancroft.

76.     In exchange for the loan, Scolari executed a promissory note dated January 30, 2006 ("2006 Promissory Note").

77.     Section 3 of the 2006 Promissory Note provides that payment of the note is "secured by the liens and security interests" relating to real properties in San Bernardino County, California, and Mohave County, Arizona, listed on exhibits to the Promissory Note.

78.     On January 31, 2006, Bancroft wired Scolari loan proceeds in the amount of $1,820,000 — exactly 70% of the $2,600,000 premium.

79.     No liens or security interests were ever perfected or recorded on the San Bernardino County, California property or the Mohave County, Arizona property.

80.     Despite conflicting representations about ownership of the properties in the Promissory Note, Scolari had actually transferred title to the San Bernardino, California property to the "2005 Scolari Separate Property Trust" on March 31, 2005.  He had transferred title to the Mohave County, Arizona property to the "2005 Scolari Separate Property Trust" on April 14, 2005.  Scolari's representation in the 2006 Promissory Note was false.

81.     Scolari never treated the Bancroft loan proceeds as income on his individual federal income tax returns.  Scolari caused his companies, who actually paid the loan interest, to take deductions for the loan interest paid as an "ordinary and necessary business expense."

82.     As it did for all Certificate Holders, ICMC provided quarterly statements to Staffworks, starting with the fourth quarter of 2005.  These statements showed Staffworks' pro rata share of Bancroft's reserves.  They also showed calculations of Staffworks' pro rata share of expenses and claims allocated to that portion of Bancroft's reserves.  These figures provided a

starting point for the calculation of what Staffowrks' premium return benefit would be, if it were eligible for such a return at that particular moment in time.

83.     Bancroft never created a segregated account for Staffworks' premium.

**I.   Staffworks, Inc. Applies for Additional Coverages from Bancroft in Late 2006, is Underwritten by ICMC, and Pays Additional Premiums.**

84.     On December 18, 2006, Scolari, on behalf of Staffworks, signed a second application (the "2006 Application") for insurance through Bancroft.

85.     On December 19, 2006, Brown forwarded additional underwriting materials to ICMC.   These materials included the typical information requested by captive insurers.   There is no evidence whatsoever that Bancroft or any of its delegees ever performed any actual underwriting analysis or calculation to determine what Staffworks' premiums should be for which risks were purportedly covered.

86.     In 2006, Staffworks paid a $5 million premium.   In addition to the eight coverages retained from 2005, the 2006 policy included six new coverages.   These coverages were excessive and had little or no utility to an on-going logistics business.   For example, the 2006 policy provided coverage for a "Loss Of Key Professional Staff."   For a $600,000 annual premium, Staffworks got a $2,700,000 benefit, payable "in case of loss of business revenue . . . as a result of the description of business operations caused by the departure of the professional staff member."   No explanation or defense of these coverages was offered by Bancroft.   Scolari denied these coverages had any business purpose other than income tax avoidance.

87.     Scolari treated Staffworks' $5,000,000 premium as a deductible "ordinary and necessary" business expense on Staffworks' 2006 federal income tax return.

88.     ABG/Brad Barros paid attorney Matt Brown approximately $300,000 in referral fees, based on the premiums paid to Bancroft/ABG by his client, Staffworks/Scolari..

**J.  Bancroft Makes its Second Commercial Loan to Scolari in January 2007.**

89.     On January 30, 2007, Scolari borrowed *from* Bancroft $3,500,000—70% of the premium he had just paid *to* Bancroft.,

90.     In exchange for the loan, Scolari executed a promissory note ("2007 Promissory Note") and a security agreement dated January 30, 2007 ("2007 Security Agreement").

91.     Section 3 of the 2007 Promissory Note provides that payment of the note is "secured by the liens and security interests" relating to real properties in Orange County, California, two properties in Skagit County, Washington, and a property in King County, Washington, listed on Exhibit A to the 2007 Promissory Note.

92.     Concurrent with his execution of the 2007 Promissory Note, Scolari also executed a separate Security Agreement dated January 30, 2007.

93.     The Security Agreement describes as "collateral" the same four properties listed on Exhibit A to the 2007 Promissory Note.

94.     Section 3.03 of the Security Agreement also provides that "[Scolari] will pay immediately, without notice, the entire unpaid indebtedness of [Scolari] to [Bancroft], whether created or incurred pursuant to this Security Agreement or otherwise, upon [Scolari's] default under this Security Agreement."

95.     In the Security Agreement, Scolari appointed Bancroft as his "attorney-in-fact . . . to execute any and all papers and instruments to do all other things necessary to preserve and protect the Collateral and to protect Secured Parties' security interest in that Collateral."

96.     The King County, Washington property listed on Exhibit A to the 2007 Promissory Note and the Security Agreement was encumbered by a pre-existing deed of trust as of January 30, 2007.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 16

97.      Contrary to his representations in the 2007 Promissory Note and Security Agreement that he held clear title to the listed properties, Scolari had transferred title to the San Clemente property to the "2005 Scolari Separate Property Trust" on April 14, 2005.

98.      No security interest was recorded in any of the four properties listed on Exhibit A to the 2007 Promissory Note and the Security Agreement.

**K.  Scolari Sells Staffworks, Inc.'s Assets and Sea Czar, Inc. Serves as the Successor Certificate Holder.**

99.      In April 2007 sold Staffworks to a third party for $53 million.

100.      Scolari formed Sea Czar, Inc., as a holding company to invest the proceeds from the sale of Staffworks' assets.

101.      On January 24, 2008, Brown (on Scolari's behalf) emailed ICMC and requested that Sea Czar, Inc. serve as Staffworks' successor Certificate Holder.

102.      Brown's email also indicated that Scolari did not want his company's coverage to terminate, because of the 100 percent surrender penalties that would be caused by his early withdrawal from the Bancroft program.

103.      For calendar year 2008, the Certificate Holder named on the certificates of insurance was Sea Czar, Inc.  Beginning with the first quarterly statement for 2008, Sea Czar, Inc. replaced Staffworks as the "participant" in the Bancroft Premium Lite program.  The 2008 coverages were equally inapplicable for a holding company with no employees:  loss of business revenue because of "Disability of Insured Employee" and "Inability of Insured Employee to Work."

104.      In 2009, Sea Czar, Inc. paid Bancroft the $5,000 minimum renewal premium.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 17

**L.  From 2006 Through 2009, Staffworks, Inc.'s/Sea Czar, Inc.'s Allocable Share of the Pooled Reserves is Credited with More Interest Than the Interest Paid by Scolari on the Commercial Loans.**

105.     From the fourth quarter of 2006 forward, Bancroft's quarterly statements for Staffworks and Sea Czar listed amounts on the line item for "interest credited this quarter" that, on an aggregated annual basis, *exceeded* the total amounts paid by Scolari in interest on the promissory notes each year.

106.     The amounts credited to Staffworks and Sea Czar exceeded the total interest paid by Scolari because, rather than crediting the entirety of Scolari's interest to only Staffworks or Sea Czar's allocable share of the reserves, as with all interest payments received by Bancroft, Bancroft credited the interest on a pro rata basis to the allocable share of the reserves of all Certificate Holders in the Premium Lite pool.

107.     Brown repeatedly raised concerns with Bancroft and ICMC that he believed the entirety of Scolari's interest payments should be credited to Staffworks' allocable share of the reserves, instead of being apportioned across the pool on a pro rata basis.  Brown could not, however, produce any written document wherein Bancroft or ICMC had ever promised that that is how the interest payment would be credited.

108.     ICMC and Bancroft rejected Brown's suggestions that ICMC's president, Tom Roberts, had agreed to such an arrangement back in 2005.

**M.  Scolari and Bancroft Negotiate the Establishment of an Incorporated Cell Through the "Maritsa Agreement."**

109.     Because Scolari wanted more investment control over the allocable reserves, Bancroft offered an alternative solution for Sea Czar to discontinue its participation in the Premium Lite program whereby a separate "incorporated cell" would be set up in Saint Lucia and Sea Czar's allocable share of the pooled reserves would migrate into the incorporated cell.

110.     From the Spring of 2009 to the Summer of 2010, Brown, on behalf of Scolari, negotiated various agreements, including the Incorporated Cell Formation and Investment Account Management Agreement and the June 14, 2010 Insurance and Management Services Operating Agreement, all associated with the planned "Maritsa IC."

111.     Scolari signed the "Incorporated Cell Formation and Investment Account Management Agreement" (the "Maritsa Agreement") on October 14, 2009.

112.     Barros signed the Maritsa Agreement on Bancroft's behalf on October 16, 2009.

113.     The Maritsa Agreement provided, in part:

a.   Bancroft will manage Maritsa for five years;

b.   Bancroft will open an account at the Bank of the West to hold cash reserves allocable to Scolari;

c.   The cash reserves are the sole property of Bancroft until such time as Maritsa meets the terms of the Assumption Reinsurance Agreement;

d.   Bancroft is authorized to withdraw funds from the cash reserves prior to transfer to Maritsa to the extent necessary to pay claims asserted in the ordinary course of Bancroft's business; and

e.   Scolari acknowledges that the promissory notes in the amount of $5,320,000 and the cash reserves in the amount of $1,643,549.01 as of July 15, 2009 constitute the sole and exclusive reserves allocable to Scolari.

**N.  Scolari, through Brown, Instructs Bancroft to Stop Further Work on Marista and Cuts Off All Contact With Bancroft.**

114.     Even before the Maritsa Agreement was finalized, in early June 2009, Bancroft's board of directors passed a resolution authorizing and approving the opening of the investment account at the Bank of the West and appointing the Bank of the West as the investment manager of the account.

115.     By October 23, 2009, Bancroft had opened the Bank of the West investment account and deposited the funds described in the Maritsa Agreement.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 19

116.   In May 2010, Bancroft withdrew $635,769.52 from the Bank of the West account and redistributed it to other Certificate Holders' allocable shares of the pooled reserves.

117.   The withdrawal from the Bank of the West account was composed of the following:

- $141,737.80 was Sea Czar, Inc.'s pro rata claims expense;

- $28,650.90 was a quarterly charge for Bancroft's 1.6 percent annual management fee as disclosed in the Applications;

- $11,591.38 was the pro rata portion of general and administrative expenses for the Premium Lite pool for 2008 as disclosed in the Applications;

- $67,895 was costs associated with impairments that Bancroft was required to take on pool assets to mark them down to fair market value;

- $150,382.95 was a one-time accounting adjustment associated with Sea Czar, Inc.'s pro rata share of the entirety of calendar year 2009's general and administrative expenses in order to have the quarterly statements more accurately correlate with the calculation of the premium return benefit; and

- $235,511.49 was a one-time reversal of an accrual associated with previous assessments to other Certificate Holders that were accrued but never paid.

118.   The $235,511.49 reversal was the sum of previous credits for "subrogation / claims recoveries this quarter" listed on the quarterly statements for the third and fourth quarters of 2008.  CBIZ's accountants instituted this reversal when, upon taking over as Bancroft's third-party administrator, they realized that ICMC had previously credited the allocable shares of the reserves of all Certificate Holders with the pro rata portions of premium assessments that had been made in 2008, but never paid.

119.   While the first four components of the withdrawal were regularly charged to Sea Czar, Inc.'s allocable share of the pooled reserves prior to the fourth quarter of 2009, the last two

1  components were one-time accounting adjustments made by Bancroft's new third-party

2  administrator, CBIZ, to all Certificate Holders' quarterly statements for the fourth quarter of

3  2009 so that the reserve values shown on the quarterly statements would more properly correlate

4  to the amount that a Certificate Holder could expect to receive as part of a potential premium

5  return benefit.

6      120.    Without prior notice, each of the charges made against Sea Czar, Inc.'s allocable

7  share of the reserves was made on a pro rata basis against the reserves of all Certificate Holders

8  in the pool.

9      121.    On Monday, July 12, 2010, Brown emailed Scolari, stating that "[t]hey are

10  moving forward rapidly now with the formation of Maritsa" and stating that Bancroft was about

11  to "spend a fair amount of money on a St. Lucia attorney, so if you do intend to litigate, I should

12  probably stop them to eliminate yet another excuse to be difficult."  Scolari then responded that

13  Brown should "let [Bancroft] know [it] should stop."

14      122.    On July 12, 2010, Brown then emailed Bancroft director Barros, stating as

15  follows:

16          Sorry to be the bearer of bad news, but I suggest you hold off on
            Maritsa as Cesar has retained Fred Turner to pursue litigation against

17          Bancroft.  He has assured me that he isn't coming after me as part of
            this, but he needs an outside litigation attorney to walk him through

18          these issues, so I am now out of the loop.

19          . . .

20          I no longer have any dog in this hunt, but based on what I have seen,
            Cesar has several bona fide claims, so I hope you appreciate the

21          severity of what I assume the claims will be and find your way to a
            quick resolution.

22

23      123.    Thereafter, Bancroft halted any further work on the formation of the Maritsa IC.

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 21

**O. Bancroft Declares Scolari to be in Default of the Promissory Notes and Commences Collection Activities.**

124.     In September and October 2010, Bancroft repeatedly requested that Brown forward copies of the promissory notes and security agreements executed by Scolari.  Brown initially refused to do so, claiming in a September 21, 2010 email to Barros that he was not "authorized to provide client documents to anyone or even to confirm they exist."

125.     The interest payments that were due as of December 31, 2009, on the 2006 Promissory Note and the 2007 Promissory Note totalled $248,724.

126.     On August 10, 2010, Bancroft's attorney, Robin Benjamin, wrote to Scolari advising him that he had failed to make the annual interest payments due under the terms of the two promissory notes on December 31, 2009, and advising Scolari that Bancroft would accelerate the balances if payment was not received by August 20, 2010.

127.     On October 19, 2010, Bancroft sent another letter to Scolari, reminding him of the overdue interest payments, and asking Scolari for "written assurances that the real property collateral securing the two promissory notes is still titled in your name and has not been further encumbered by any superior liens or security interests."  Scolari failed to respond to the letter.

128.     Scolari did not make any payments on the two promissory notes, and Bancroft commenced this action on January 6, 2010.

**P. Bancroft Assesses Sea Czar, Inc. Additional Premium.**

129.     The 2009 – 2010 coverage amounts for Sea Czar were calculated based on each Certificate Holder's respective allocable share of reserves.  Bancroft decided to increase coverage limits (without consulting with or obtaining permission from the insured).  Based on the pool's available reserves, Bancroft dramatically increased the coverage limits:

|  | 2009 limit | 2010 limit |
|---|---|---|
| Technical Equipment | 24,935.21 | 6,190,000 |
| Tax Audit | 100,000.00 | 6,190,000 |
| Business Litigation | 138,240.94 | 6,190,000 |
| Reps. & Warranties | 500,000.00 | 6,190,000 |
| Employee Disability | 768,491.73 | 6,190,000 |
| Employee Inability to Work | 1,161,223.86 | 6,190,000 |
|  | 2,692,896.74 | 37,140,000 |

130.     In March 2011, Bartlett Actuarial performed calculations for a number of Bancroft Certificate Holders to determine whether their allocable shares of the reserves supported the amounts of coverage then in place.

131.     As to Sea Czar, Inc., Bartlett Actuarial concluded that the unimpaired reserves supported $1,275,493 in coverage, and not the $6,190,000 per occurrence limits listed on the Sea Czar, Inc. certificates of insurance.

132.     Accordingly, on March 8, 2011, Stuart Anolik of CBIZ issued a letter to Sea Czar, Inc. advising that a premium assessment of $4,875,000 (60 percent of the premiums paid since inception), was necessary to continue supporting the coverage limits then in place.  The letter quoted the Group Master Policy provision permitting retrospective premium assessments, and advised that failure to pay the assessment within 30 days would lead to the termination of all benefits payable, including the premium return benefit.

133.      Scolari did not pay the assessment, and on May 25, 2011, Anolik sent Scolari a letter advising him that Sea Czar's coverage, and any right to a premium return benefit, had been cancelled.

134.     On December 27, 2012, CBIZ sent Scolari a letter advising Scolari that its calculation of 60% of the amount of premiums paid since inception as stated in the April 8, 2011

1  letter from Anolik had been in error.  The December 27, 2012 letter provided Sea Czar until

2  January 27, 2013, in which to pay $4,560,000 and reinstate coverage retroactively.

3      135.    Neither Scolari or Sea Czar paid the revised premium assessment described in

4  CBIZ's December 27, 2012 letter.

5      136.    Neither Staffworks nor Sea Czar ever suffered any covered losses or made any

6  insurance claims under any Bancroft policy.

7  **CONCLUSIONS OF LAW**

8      In its August 23, 2013 Order, the Court concluded that it did not believe the parties or

9  their lawyers.  Having heard the testimony and reviewed the exhibits, the Court remains

10  convinced that the parties lack credibility as to their intent and motive in participating in this

11  scheme.

12      1.    The Court has jurisdiction by reason of diversity of citizenship.  28 U.S.C. §

13  1332.  This Court's jurisdiction was invoked by Bancroft to enforce collection efforts against

14  two promissory notes.  Defendant Scolari may assert any equitable defenses which he may have

15  as to any actions arising from the Promissory Notes and/or arising from the Security

16  Agreement(s).

17      2.    The  choice of law provisions in both of the Promissory Notes Scolari signed

18  specify that the law of California applies, and the choice of laws provision in the Security

19  Agreement which Scolari signed specifies that the laws of Washington State applies.

20      3.    The Court concludes from all the evidence adduced at trial that:

21      A) Tom Roberts was Bancroft's agent;

22      B) The "Premium Lite" program and the commercial loan program are inexorably linked in a scheme to defraud the United States from tax

23      revenues otherwise owed by Staffworks and/or Cesar Scolari;

24      C) The insurance contracts and the related promissory notes and security

1           agreement(s) taken together constitute an illegal contract.

2

3        4.     Washington law holds that an illegal contract can arise if any act in connection

4 with the contract establishes a "… practice or course of business which operates or would

5 operate as a fraud or deceit upon any person" as noted in *Golberg v. Sanglier,* 96 Wash.2d 874,

6 639 P.2d 1347, 1352 (1982).

7        5.     The Bancroft Premium Lite Program, including the two Application and

8 Subscription Agreements which Scolari signed in 2005 and 2006, as well as the two promissory

9 notes which Scolari signed in 2006 and 2007, are "illegal contracts," inasmuch as the

10 transactions in total, constitute an improper attempt to circumvent United States tax laws.

11        6.     Based upon the totality of the evidence the Court declines to award any

12 affirmative relief to either party to this transaction and, consequently, the Court rules against

13 both parties on each and every one of their respective claims and counterclaims, herein.

14        7.     The Court further concludes that no pendant or further relief will be awarded to

15 either party in regard to any costs, attorney's fees, or other collateral issues arising from this

16 case. The Promissory Notes, the Security Agreements, and the Insurance Policies are not valid

17 and are not enforceable.

18        Dated this 6th day of December, 2013.

19

20                     _____

21                     RONALD B. LEIGHTON
                    UNITED STATES DISTRICT JUDGE

22

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 25